In re Rene GRECO, aka Mrs. Rene Greco, Debtor.

In re Anthony GRECO, aka Tony Greco, Debtor.

Bankruptcy Nos. 80–00197, 0095–1–79–00484.

United States Bankruptcy Court, D. Hawaii.

Aug. 10, 1984.

Lex R. Smith, Honolulu, Hawaii, for Troy Corp.

William Crockett, Wailuku, Hawaii, for Landlord.

Edward J. Bybee, James C. McWhinnie, Honolulu, Hawaii, for Rene Greco.

Erik R. Zen, Honolulu, Hawaii, for Anthony Greco.

JON J. CHINEN, Bankruptcy Judge.

The Motion of the Trustees of the Richard Kazuo Kishi Trust, ("Kishis"), for the Court to reconsider and vacate its May 8, 1984 Order granting the Motion of the Melvyn Choy, Evan Cruthers, Desmond Brooks and Thomas Pagliuso and Troy Corporation to Approve the Second Revised Sublease to Spencecliff Corporation and the Amended Sublease to Surfsports Hawaii, Inc., to Terminate the Grecos' Claim to Possession and Rental from the Reserved Premises, and to Order the Kishis to Execute Attornment and Estoppel Documents having been considered by this Court, and the Court having held evidentiary hearings on July 10, 11, and 12, 1984, regarding the issue of whether the rental to be paid by Spencecliff to Troy under the Second Revised Sublease constitutes that which would be charged by Troy Corporation if it assumed the construction obligations, and counsel William Crockett, Lex Smith, Erik Zen, and James McWhinnie appearing, and the Court having considered all of the evidence, pleadings and arguments of counsel and being fully advised in the matter, makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. On February 21, 1975, the debtors herein, Rene and Anthony Greco, entered into a Lease with the Kishis covering the property located at 736 Front Street, Lahaina, Maui.

2. On September 20, 1978, the Grecos entered into a Development Sublease with Troy Corporation.

3. On November 16, 1979, Anthony Greco filed for relief under Chapter 11 of the Bankruptcy Act. On March 25, 1980, Rene Greco filed for relief under Chapter 11 of the Bankruptcy Act.

4. On May 12, 1980, Rene Greco filed an Application to Assume the Lease and to enter a new sublease with Troy Corporation. The Kishis opposed Rene Greco's Application to Assume the Lease.

5. To compromise their differences and to provide a basis for reorganization of the Greco Estate, the Kishis, the Grecos and Troy Corporation agreed on a series of transactions whereby the Grecos were to surrender the lease to the Kishis and cancel the Development Sublease with Troy Corporation. At the same time, Kishis and Troy Corporation were to enter into a new long term lease, ("Kishi-Troy Lease"). These transactions were presented to the court in an "Application for Approval of Settlement" which was heard on June 30, 1980, together with the hearing on the confirmation of the Plan of Reorganization submitted by Rene Greco.

6. Counsel for the Kishis appeared at the hearing on June 30, 1980 and requested several revisions in the proposed lease between the Kishis and Troy Corporation which revisions were accepted by Troy Corporation. The Plan of Reorganization was thereafter approved by the Court.

7. The Kishi-Troy Lease does not require consent on the part of the Kishis to a sublease by Troy Corporation. The Lease provides, in pertinent part:

11(c) *Subleases.* Lessee shall have the right, from time to time during the term of this lease, to sublet all or any part or portion of the premises to one or more qualified persons or entities without the prior consent or approval of the Lessors.

8. Section 2 of the Kishi-Troy Lease provides, in part:

Lessors and Lessee understand that the Lessee intends to sublease parts of the premises to (a "Subtenant") who will have possession of, and operate and use the same in the highest and best use, to carry on an active business under a sublease instrument (a "Sublease"), that will provide for the payment of various amounts to the Lessee, which will be the basis for the computation and payment to the Lessors of the quarterly percentage rent.

9. The Kishi-Troy Lease entitled the Kishis to quarterly percentage rent in an amount equal to ten percent (10%) multiplied by the gross receipts for the premises. Said lease defines "Gross Receipts for the Premises," in part, as:

[A]ll payments of any kind received by the Lessee for the use, possession or operation of the premises, or any part thereof, from any person (including without limitation rents, leasehold premiums, franchise fees or the like).

10. Under the Kishi-Troy Lease, Troy Corporation is to cause the existing premises to be renovated so that there will be a building of a minimum of 7,500 net rentable square feet.

11. Troy Corporation (as sublessor) and Spencecliff Corporation (as sublessee) have executed a document entitled "Second Revised Sublease," which terminates on January 30, 2035.

12. Under the Second Revised Sublease, Spencecliff will renovate the building to provide a minimum of 7,500 square feet net rentable area.

13. Experts testifying at the hearing stated that it is impossible to tell from the drawings presently available whether there will be more than 7,500 square feet available when the renovation is completed.

14. The Second Revised Sublease, has among others, the following provisions:

(a) Spencecliff is to pay rent beginning February 1, 1984.

(b) Spencecliff is to complete renovation of the subject property on or before July 31, 1985.

(c) Spencecliff is to pay monthly rent upon completion of the renovation in the amount of $10,000 or 7% of Spencecliff's gross sales whichever is greater.

(d) Fixed minimum rents paid (or credited) are to be adjusted two years and nine months after completion of the renovation to the greater of either (a) $10,000 or (b) 85% of average monthly rent (fixed and percentage, without regard to rent credits) during the preceding 2 years and 9 months. Thereafter, fixed rent will be adjusted every ten years to either (a) the fixed rent for the previous fixed rent period or (b) 85% of average monthly rent during the previous three years (fixed and percentage, without regard to rent credits) whichever is greater.

(e) Fixed rents are to be adjusted periodically according to the percentage rents paid by Spencecliff. Accordingly, the fixed rent will be adjusted according to the amount of business done on the premises.

15. Troy Corporation will pay the costs of renovation of the property, together with 12% interest, through credits against Spencecliff's rent. Section 4 of the Second Revised Sublease provides for Spencecliff to offset the construction costs against rent by a set formula.

16. Section 4(d) of the Second Revised Sublease specifically states:

It is the intent of the parties that this construction credit will not affect Troy Corporation's "gross receipts" upon which the rent from Troy Corporation to the Kishi Trust is based.

17. The experience and past success of a restaurant operator are significant factors to be taken into consideration when determining whether the rent provisions of a given lease are fair and reasonable. A tenant with numerous prior successful restaurant operations will generally pay lower rent than a tenant entering its first restaurant venture.

18. The most desirable portion of the subject building is the portion closest to the street on the ground floor level. Other than the ground floor portion closest to the street, the most desirable portion of the subject building is the upstairs portion closest to the street. The portions of the property located farthest away from Front Street are the least desirable, and the fair rental value of these portions is much less than the front portions.

19. The rental value of the portions of the subject property located farthest away from Front Street is further diminished by the fact that the rear portion of the property is only twenty-five feet wide, while the front portion is 42 feet wide.

20. At the hearing, expert witnesses for both Troy Corporation and the Kishis used as a "comparable" a sublease, made July 5, 1984 between Kiare Enterprises ("Kiare") and West Maui Restaurant, Inc., ("Kiare Sublease") for the adjoining building.

21. The Kiare Sublease covers the entire second floor of the Kiare Building, approximately 3,200 square feet, together with that portion of the first floor immediately facing Front Street sufficient for an entry and stairway to the second floor restaurant. In addition, section 21.01 of the Kiare Sublease gives the tenant an option on a first floor retail space which faces Front Street.

22. The Kiare Sublease provides for a percentage rent of 7 ½% through October 31, 1984, and thereafter 8% of annual gross sales up to $1,400,000; 5% of annual gross sales over $1,400,000 through $2,000,000 and 4% for sales above $2,000,000.

23. Expert witnesses estimated that under the Amended Sublease to Surfsports Hawaii, Inc., Surfsports would occupy approximately 1,200 square feet of desirable space on the first floor facing Front Street. If the Kishi building, after renovation, contains 7,500 square feet net rentable area, Spencecliff will occupy approximately 6,300 square feet. Thus, Spencecliff will pay fixed rent of approximately $1.58 per square foot.

24. If Spencecliff and/or Troy are able to construct a building larger than 7,500 square feet net rentable area, there will be no prejudice to the Kishis.

25. The fact that the subject property has been involved in protracted and continuing litigation has a tendency to reduce the amount of rent at which Troy Corporation could sublease the property.

26. The fact that any sublease entered by Troy Corporation is subject to the approval of Rene Greco and Anthony Greco has a tendency to reduce the amount of rent which Troy Corporation could charge for the property.

27. Although the Kishi-Troy Lease specifically permits Troy to sublease without the consent of the Kishis, any sublease entered by Troy Corporation is subject to attack by the Kishis. This possibility of additional litigation before this Court tends to reduce the amount of rent which Troy Corporation can charge for the property.

28. The fact that, at the time negotiations were entered with Spencecliff, the entire front portion of the property was leased to Surfsports Hawaii, Inc., necessitating negotiation with Surfsports Hawaii, Inc. in order to obtain important ground floor frontage on Front Street, has a tendency to reduce the amount of rent which Troy Corporation can charge for the property.

29. The Second Revised Sublease gives Spencecliff the right to terminate the sublease if a variance is not granted with respect to county and municipal requirements for the provision of off-street parking. If no variance is granted, Spencecliff will be required to either purchase offsite parking or terminate the sublease.

30. Substantial renovation of the property will require that offsite parking be provided. Although Spencecliff has the right to terminate the Second Revised Sublease in the event that a parking variance is not granted, the fact that after renovation any tenant will have to either obtain a variance or provide parking is likely to reduce the number of tenants interested in subleasing the property, thus reducing the fair rental value of the property.

31. The two witnesses for Troy Corporation acknowledged that, if Troy Corporation had constructed the improvements, Troy Corporation would have to recover the construction costs within the term of the lease. Such costs may be part of the lease rent. However, both witnesses further testified that, under all the circumstances surrounding the Kishi's property, a minimum of $10,000 was a fair return to Troy Corporation. They testified that Troy Corporation is unlikely to find a tenant willing to pay a higher rent than provided under the Second Revised Sublease.

32. The witness for Kishi's agreed that a minimum rent ranging between $8000.00 and $12,000 per month is fair.

33. Troy Corporation has diligently and efficiently undertaken to sublease parts of the premises at the highest and best rents to subtenants.

34. Pursuant to the Second Revised Sublease, Spencecliff intends to borrow funds to pay for the cost of construction on the subleased premises. Troy requests that this Court order the Kishi Trustees to execute a consent and estoppel certificate (in the form of exhibit B attached to the Second Revised Sublease) to Spencecliff's lender for the loan.

35. Spencecliff is a subtenant of Troy. The Master Lease between Kishis and Troy provides for the protection of a mortgage of Troy's leasehold estate. The Master Lease does not contain any provision whereby the Kishi Trustees agreed to execute an instrument to protect a mortgage of a subtenant's subleasehold estate.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the Kishi-Troy Lease as it affects the Greco Estate. The cancellation of the Kishi-Greco Lease, the execution of the new Kishi-Troy Lease and the execution of the Trust documents were part of one transaction. Anything dealing with the Kishi-Troy Lease which affects the Greco Estate is a related proceeding.

2. The Kishis' effort to prevent Troy Corporation from subleasing the property to Spencecliff Corporation is a related proceeding affecting the Greco Estate, thus this Court has jurisdiction over the matter.

3. The Kishi-Troy Lease does not require consent on the part of the Kishis to a sublease by Troy Corporation.

4. The Second Revised Sublease between Troy Corporation and Spencecliff Corporation does not violate terms of the Kishi-Troy Lease. Troy Corporation has complied with all terms and requirements of the Kishi-Troy Lease relating to subleases, including all provisions of section 2 of the Kishi-Troy Lease relating to percentage rents payable by Troy Corporation to the Kishis.

5. The Kishi-Troy Lease requires Troy Corporation to pay to the Kishis percentage rent based on the total rent received by Troy Corporation for the use, possession or operation of the premises whether paid in cash or otherwise. In computing percentage rent due to the Kishis, Troy Corporation must include in its "gross receipts for the premises" all rents which are credited against the costs of construction on the premises as well as those which are received in cash.

6. Troy Corporation is not entitled to a specific performance judgment that compels the Kishi Trustees to execute the Kishi/Spencecliff Lender Consent because the Master Lease does not contain any provision whereby the Kishi Trustees agreed to execute such an instrument on behalf of a subtenant's mortgagee.

Let Judgment be entered accordingly.